**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Civil Action No.

| | |
|---|---|
| SAMUEL PHILBRICK<br>59 Prospect Street<br>Henniker, NH 03242 | ) <br> ) <br> ) <br> ) |
| IAN LUDDERS<br>168C Quaker City Road<br>Unity, NH 03603 | ) <br> ) <br> ) <br> ) |
| KARIN VLK<br>12 Harrison Street<br>Laconia, NH 03246 | ) <br> ) <br> ) <br> ) |
| JOSHUA VLK<br>12 Harrison Street<br>Laconia, NH 03246 | ) <br> ) <br> ) <br> ) |
| on behalf of themselves and all others similarly<br>situated, | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | ) <br> ) <br> ) |
| ALEX M. AZAR II<br>SECRETARY, UNITED STATES DEPART-<br>MENT OF HEALTH AND HUMAN SERVICES<br>in his official capacity<br>200 Independence Avenue, S.W.<br>Washington, DC 20201 | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| SEEMA VERMA<br>ADMINISTRATOR, CENTERS FOR MEDI-<br>CARE & MEDICAID SERVICES<br>in her official capacity<br>7500 Security Boulevard<br>Baltimore, MD 21244 | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| UNITED STATES DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES<br>200 Independence Avenue, S.W.<br>Washington, DC 20201 | ) <br> ) <br> ) <br> ) <br> ) |

1

CENTERS FOR MEDICARE & MEDICAID )
SERVICES )
7500 Security Boulevard )
Baltimore, MD 21244 )
)
                    Defendants. )

_____

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
_____

### PRELIMINARY STATEMENT

1.     This case challenges the ongoing efforts of the Executive Branch to bypass the legislative process and act unilaterally to fundamentally transform Medicaid, a cornerstone of the social safety net. Purporting to invoke a narrow statutory waiver authority that allows experimental projects "likely to assist in promoting the objectives" of Medicaid, the Executive Branch has instead effectively rewritten the statute, ignoring congressional restrictions, overturning a half-century of administrative practice, and threatening irreparable harm to the health and welfare of the poorest and most vulnerable in our country.

2.     The Medicaid Act establishes a health insurance program that provides coverage to more than 75 million people in the United States. Medicaid enables states to provide a range of federally specified preventive, acute, and long-term health care services to individuals "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1. The core populations covered by Medicaid include low-income children; pregnant women; the aged, blind, or disabled; and, as added by the Affordable Care Act ("ACA"), non-disabled, childless adults with incomes less than 133% of the federal poverty level ("FPL") (currently $16,612 for an individual; $22,490 for a family of two) ("the Medicaid expansion population").

2

3.      The Medicaid program offers a deal for states. If a state chooses to participate, the federal government will contribute the lion's share of the cost of providing care. In return, the state agrees to pay the remaining portion of the costs of care and to follow all federal requirements, including those regarding the scope of coverage and eligibility for the program. States may not impose additional eligibility requirements other than those set forth in the Medicaid Act, and states must cover all individuals that fit within a covered population group.

4.      The Social Security Act, of which the Medicaid Act is a part, does permit the Secretary of Health and Human Services ("Secretary" or "HHS") to waive certain federal Medicaid requirements, but only in narrow circumstances—when necessary to allow a state to carry out an experimental or pilot program that is likely to promote the objectives of the Medicaid Act.

5.      New Hampshire obtained such a waiver to change the way that the State provided coverage to the Medicaid expansion population group. Beginning January 1, 2016, New Hampshire provided coverage to this group by paying the premiums for private health plans offered through the federal Marketplace established by the ACA. This program was called "New Hampshire Health Protection Program (NHHPP) Premium Assistance." The approval extended through December 31, 2018.

6.      In August 2016, New Hampshire asked the Secretary of HHS to amend the NHHPP Premium Assistance Program to condition participants' Medicaid coverage on their compliance with work requirements. Consistent with previous agency actions, in November 2016, HHS denied New Hampshire's request, finding that it "could undermine access, efficiency, and quality of care provided to Medicaid beneficiaries and do[es] not support the objectives of the Medicaid program." Letter from Vikki Wachino, Dir., Ctr. for Medicaid & CHIP Servs., to Jeffrey A. Meyers, Comm'r, N.H. Dep't of Health & Human Servs. (Nov. 1, 2016),

https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/nh/health-protection-program/nh-health-protection-program-premium-assistance-cms-response-110116.pdf (last visited Mar. 20, 2019).

7.      Early in 2017, the current HHS abruptly reversed course, signaling to states that it would revise its use of the waiver authority in Medicaid as part of President Trump's vow to "explode" the ACA and its Medicaid expansion. On October 24, 2017, New Hampshire again asked the Secretary of HHS to amend the NHHPP Premium Assistance Program to condition Medicaid coverage on a work requirement.

8.      While this request was pending, HHS announced a new Medicaid waiver policy in a January 2018 letter to State Medicaid Directors ("State Medicaid Letter"). Reversing previous agency guidance, and consistent with the Administration's expressed vow to "fundamentally transform Medicaid," the State Medicaid Letter announced HHS's intention to, for the first time, approve waiver applications that condition Medicaid recipients' coverage on compliance with work requirements and established the "guidelines" for states to obtain approval of such applications.

9.      On May 7, 2018, citing the State Medicaid Letter, the Secretary approved the NHHPP Premium Assistance Program Amendment, adding work requirements as a condition of Medicaid eligibility. The approval provided that implementation could not begin before January 1, 2019. However, the timeframe of the waiver was not extended, so the Secretary's approval lasted only through December 31, 2018. Then, on November 30, 2018, the Secretary approved an extension of the work requirements through December 31, 2023, in a program titled "Granite Advantage." The Granite Advantage approval also permitted the state to deny retroactive coverage to Medicaid recipients.

10.     The State is currently implementing the waiver. Retroactive coverage ended on January 1, 2019. Individuals must begin completing work activities in June 2019, and their coverage can be terminated for noncompliance beginning August 1, 2019.

11.     The approved waiver will harm Plaintiffs and individuals throughout the State who need a range of health services, including check-ups, mental health services, insomnia treatments, vision services, surgeries, and medications. Without access to Medicaid coverage, Plaintiffs will be forced to forgo treatment for their conditions or will incur significant medical debt when their conditions become so severe that they have no choice but to seek treatment in acute care and emergency department settings. Without retroactive coverage, when Plaintiffs experience gaps in coverage they will be forced to skip medical treatment or incur out of pocket expenses and medical debt.

12.     The State Medicaid Letter and subsequent approval of New Hampshire's applications are unauthorized attempts to re-write the Medicaid Act, and the use of the Social Security Act's waiver authority to "transform" Medicaid is an abuse of that authority. The Defendants' actions here thus violate both the Administrative Procedure Act and the Constitution, and they cannot survive.

## JURISDICTION AND VENUE

13.     This is a class action for declaratory and injunctive relief for violations of the Administrative Procedure Act, the Social Security Act, and the United States Constitution.

14.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1361, and 5 U.S.C. §§ 702 to 705. This action and the remedies it seeks are further authorized by 28 U.S.C. §§ 1651, 2201, and 2202, and Federal Rule of Civil Procedure 65.

15.     Venue is proper under 28 U.S.C. § 1391(b)(2) and (e).

## PARTIES

16.     Plaintiff Samuel Philbrick is 26 years old and lives in Henniker, New Hampshire. Mr. Philbrick is enrolled in the New Hampshire Medicaid program.

17.     Plaintiff Ian Ludders is 40 years old and lives in Unity, New Hampshire. Mr. Ludders is enrolled in the New Hampshire Medicaid program.

18.     Plaintiff Karin VLK is 36 years old and lives in Laconia, New Hampshire. Mrs. VLK is enrolled in the New Hampshire Medicaid program.

19.     Plaintiff Joshua VLK is 30 years old and lives in Laconia, New Hampshire. Mr. VLK is enrolled in the New Hampshire Medicaid program.

20.     Defendant Alex M. Azar II is the Secretary of the United States Department of Health and Human Services and is sued in his official capacity. Defendant Azar has overall responsibility for implementation of the Medicaid program, including responsibility for federal review and approval of state requests for waivers pursuant to Section 1115 of the Social Security Act.

21.     Defendant Seema Verma is Administrator of the Centers for Medicare & Medicaid Services ("CMS") and is sued in her official capacity. Defendant Verma is responsible for implementing the Medicaid program in the manner required by federal law, including as amended by the ACA.

22.     Defendant HHS is a federal agency with responsibility for overseeing implementation of provisions of the Social Security Act, of which the Medicaid Act is a part.

23.     Defendant CMS is the agency within HHS with primary responsibility for overseeing federal and state implementation of the Medicaid Act as required by federal law.

**CLASS ACTION ALLEGATIONS**

24.     Plaintiffs bring this suit both individually and on behalf of a statewide class of persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2). The class consists of all residents of New Hampshire enrolled in the New Hampshire Granite Advantage program on or after January 1, 2019.

25.     The prerequisites of Federal Rule of Civil Procedure 23(a) are met in that:

    a.  The class is so numerous that joining all members is impracticable. The State has estimated that tens of thousands of adults will be enrolled in Granite Advantage as of January 1, 2019 and in each year of the Section 1115 project. *See* Letter from Christopher T. Sununu, Gov. of N.H., to Alex M. Azar II, Sec'y, U.S. Dep't of Health & Human Servs. 9 (July 23, 2018) ("Granite Advantage Application"), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/nh/nh-health-protection-program-premium-assistance-pa4.pdf (last visited Mar. 20, 2019). According to New Hampshire's Medicaid Director, more than 25,000 Medicaid beneficiaries will need to comply with the work requirements and at least 10,000 more will be required to report on their exempt status each month. Statement of Henry Lipman, Dir., N.H. Medicaid, N.H. Rulemaking Hearing on the N.H. Granite Advantage Health Care Program (Mar. 5, 2019). The class members are geographically dispersed throughout the State, have limited financial resources by virtue of their Medicaid eligibility, and are unlikely to institute individual actions;

    b.  There are questions of fact and law, particularly as to the legality of the Defendants' policies and decisions with respect to issuance of the State Medicaid Letter and

approval of the Granite Advantage waiver, that are common to all members of the class;

c. The claims of the named plaintiffs are typical of the claims of the class; and

d. The named plaintiffs and their counsel will fairly and adequately protect the interests of the class. Each plaintiff is an adult resident of New Hampshire who is enrolled in the Granite Advantage program and will be subject to the requirements of the Granite Advantage waiver.

26. The requirements of Federal Rule of Civil Procedure 23(b)(2) are met in that the Defendants have acted or refused to act on grounds that apply generally to the class, making final declaratory and injunctive relief appropriate with respect to the class as a whole.

## BACKGROUND AND FACTUAL ALLEGATIONS

### A. The Medicaid Program

27. Title XIX of the Social Security Act establishes the cooperative federal-state medical assistance program known as Medicaid. *See* 42 U.S.C. §§ 1396 to 1396w-5. Medicaid's stated purpose is to enable each state, as far as practicable, "to furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the costs of necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." *Id.* § 1396-1.

28. The statute defines "medical assistance" to include a range of health care services that participating states must cover or are permitted to cover. *Id.* § 1396d(a).

29. Although states do not have to participate in Medicaid, all have chosen to do so.

30. Each participating state must maintain a comprehensive state Medicaid plan for medical assistance that the Secretary has approved. *Id.* § 1396a.

8

31.     The state Medicaid plan must describe the state's Medicaid program and affirm its commitment to comply with the requirements imposed by the Medicaid Act and its associated regulations.

32.     States and the federal government share responsibility for funding Medicaid. Section 1396b requires the Secretary to pay each participating state the federal share of "the total amount expended . . . as medical assistance under the State plan." *Id*. §§ 1396b(a)(1), 1396d(b). The federal reimbursement rate is based on the state's relative per capita income.

### B.     Medicaid Eligibility and Coverage Requirements

33.     Using household income and other specific criteria, the Medicaid Act sets forth who is eligible to receive Medicaid coverage. *Id*. § 1396a(a)(10)(A), (C). The Act identifies required coverage groups as well as options for states to extend Medicaid to additional population groups. *Id.*

34.     To be eligible for federal Medicaid funding, states must cover, and may not exclude from Medicaid, individuals who: (1) are part of a mandatory population group; (2) meet the minimum financial eligibility criteria applicable to that population group; (3) are residents of the state in which they apply; and (4) are U.S. citizens or certain qualified immigrants. *Id*. §§ 1396a(a)(10)(A), 1396a(b)(2), (3); 8 U.S.C. §§ 1611, 1641.

35.     The mandatory Medicaid population groups include children; parents and certain other caretaker relatives; pregnant women; and the elderly, blind, and disabled. 42 U.S.C. § 1396a(a)(10)(A)(i).

36.     In 2010, Congress passed, and the President signed, comprehensive health insurance reform legislation, the Patient Protection and Affordable Care Act ("ACA"). Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act

of 2010, Pub. L. No. 111-152, 124 Stat. 1029. "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

37.     As part of the effort to ensure comprehensive health insurance coverage, Congress amended the Medicaid Act to add an additional mandatory population group. Effective January 1, 2014, the Medicaid Act requires participating states to cover adults who are under age 65, are not eligible for Medicare, do not fall within another Medicaid eligibility category, and have household incomes below 133% FPL. 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII), (e)(14). This group is often called the "expansion population," and it includes adults in a variety of family circumstances: parents living with children (whose incomes exceed the state-established limit for the mandatory parent/caretaker relative population group); parents of older children who have left the home; and adults without children.

38.     States receive enhanced federal reimbursement rates for medical assistance provided to the Medicaid expansion population: 94% federal dollars in 2019, and 90% for 2020 and each year thereafter. *Id.* § 1396d(y).

39.     The Supreme Court's decision in *National Federation of Independent Business v. Sebelius* barred HHS from terminating Medicaid funding to states that choose not to extend Medicaid coverage to the expansion population. 567 U.S. 519 (2012).

40.     States that cover the expansion population submit state plan amendments electing to provide this coverage. To date, 37 states (including DC) have approved state plans covering the expansion population.

41.     New Hampshire has an approved state Medicaid plan that covers the expansion population.

42.     Once a state elects to expand coverage to the expansion population, it becomes a mandatory coverage group. *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).

43.     As noted above, the Medicaid Act allows states to extend Medicaid eligibility to certain optional population groups, including: children and pregnant women with incomes between 133% and 185% of FPL, *see id.* § 1396a(a)(10)(A)(ii)(IX), limited-income aged, blind, and/or disabled individuals receiving home and community-based services, *id.* § 1396a(a)(10)(A)(ii)(VI), and "medically needy" individuals who would fall within a mandatory population but for excess income or resources, *id.* § 1396a(a)(10)(C).

44.     The Medicaid Act requires a participating state to cover *all* members of a covered population group. In other words, the state may not cover subsets of a population group described in the Medicaid Act. *Id.* § 1396a(a)(10)(B). This requirement applies to optional and mandatory population groups. Thus, if a state elects to cover an optional group, it must cover all eligible individuals within that group. *Id.*

45.     States cannot impose additional eligibility requirements that are not explicitly allowed by the Medicaid Act. *See id.* § 1396(a)(10)(A).

46.     In addition to addressing *who* is eligible for medical assistance, the Medicaid Act mandates *how* states must make and implement eligibility determinations to ensure that all eligible people who apply are served and get coverage.

47.     States must determine eligibility and provide medical assistance to all eligible individuals with "reasonable promptness." 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.912(c)(3) (requiring states to determine eligibility within 90 days for individuals who apply on the basis of disability and 45 days for all other individuals). An individual may apply for and enroll in Medicaid at any time. 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.906.

11

48.     The Medicaid Act has also always required states to provide retroactive coverage to ensure that people can obtain timely care and avoid incurring medical debts. Social Security Amendments of 1965, Pub. L. No. 89-97, § 1905(a), 79 Stat. 286, 351 (codified at 42 U.S.C. §§ 1396a(a)(34), 1396d(a)); *see also* S. Report No. 92-1230, 92nd Congress, 2nd Session, pg. 209 (1972) (noting the purpose of retroactive coverage is to protect individuals "who are eligible for [M]edicaid but do not apply for assistance until after they have received care, either because they did not know about the [M]edicaid eligibility requirements or because the sudden nature of their illness prevented their applying."). Specifically, states must provide medical assistance for care provided in or after the third month before the month of application, as long as the enrollee would have been eligible for Medicaid at the time the services were received. 42 U.S.C. §§ 1396a(a)(34), 1396d(a).

49.     The Medicaid Act requires states to "provide such safeguards as may be necessary to assure that eligibility . . . and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." *Id.* § 1396a(a)(19).

**C.     The Secretary's Section 1115 Waiver Authority**

50.     Section 1115 of the Social Security Act, codified at 42 U.S.C. § 1315, grants the Secretary authority to waive a state's compliance with certain requirements of the Medicaid Act under certain conditions.

51.     The Secretary may grant a Section 1115 Medicaid waiver only in the case of an "experimental, pilot, or demonstration project which . . . is likely to assist in promoting the objectives" of the Medicaid Act. *Id.* § 1315(a).

52.     The Secretary may only waive requirements of Section 1396a for Section 1115 projects relating to Medicaid. *Id.* § 1315(a)(1).

53.     The Secretary may not waive compliance with requirements that Congress has placed outside of Section 1396a.

54.     The Secretary may grant a Section 1115 waiver only to the extent and for the period necessary to enable the state to carry out the experimental, pilot, or demonstration project. *Id.*

55.     The costs of such a project, upon approval, are included as expenditures under the State Medicaid plan. *Id.* § 1315(a)(2).

56.     The Secretary must follow certain procedural requirements before he may approve a Section 1115 project. *Id.* § 1315(d); 42 C.F.R. §§ 431.400 to 431.416. In particular, after receiving a complete application from a state (following a state-level public comment period), the Secretary must provide a 30-day public notice and comment period. 42 U.S.C. § 1315(d); 42 C.F.R. § 431.416.

57.     The Secretary does not have the authority under Section 1115 to waive compliance with other federal laws, such as the United States Constitution, the Americans with Disabilities Act, or other federal statutes.

58.     For example, the Fair Labor Standards Act ("FLSA") requires that all individuals, including individuals receiving public benefits, be compensated at least the minimum wage in exchange for hours worked. *See* 29 U.S.C. § 206(a)(1)(C); Dep't of Labor, *How Workplace Laws Apply to Welfare Recipients* at 2 (1997), https://nclej.org/wp-content/uploads/2015/11/LaborProtectionsAndWelfareReform.pdf (last visited Mar. 20, 2019). Notably, the Supplemental Nutrition Assistance Program ("SNAP") and Temporary Assistance for Needy Families ("TANF") statutes specifically refer to work requirements and further describe how the benefits interact with the FLSA minimum wage protections. *See* 7 U.S.C. § 2029(a)(1) (SNAP); 42 U.S.C. § 607 (TANF). There are no such references or descriptions in the Medicaid

Act. According to the Department of Labor, medical assistance, unlike SNAP and TANF cash benefits, may not be substituted for a wage. *See How Workplace Laws Apply to Welfare Recipients* at 4.

### D.   Medicaid in New Hampshire

59.   New Hampshire, like all other states, has elected to participate in Medicaid. *See* N.H. Rev. Stat. Ann. §§ 167:63; 161:4-a(X). The New Hampshire Department of Health & Human Services ("NHDHHS") administers the program at the state level.

60.   The federal government typically reimburses New Hampshire for 50% of the cost of providing medical assistance through its Medicaid program. *See* 81 Fed. Reg. 80078-79 (Nov. 15, 2016) (fiscal year 2018); 82 Fed. Reg. 55383-85 (Nov. 21, 2017) (fiscal year 2019); 83 Fed. Reg. 61157-01 (Nov. 28, 2018) (fiscal year 2020).

61.   Effective July 1, 2014, New Hampshire amended its state Medicaid plan to include the Medicaid expansion population, *i.e.*, adults who are under age 65; who do not fit into another Medicaid (or Medicare) eligibility category; and who have household income below 133% of FPL. *See* New Hampshire State Plan Amendment 14-0004, https://www.medicaid.gov/State-resource-center/Medicaid-State-Plan-Amendments/Downloads/NH/NH-14-0004.pdf (last visited Mar. 20, 2019). The expansion is also referred to as the New Hampshire Health Protection Program (NHHPP).

62.   As noted above, New Hampshire receives enhanced federal reimbursement for medical assistance provided to the expansion population: 94% federal dollars in 2019, and 90% for 2020 and each year thereafter. 42 U.S.C. § 1396d(y).

63.   The Medicaid expansion in New Hampshire covers over 50,000 people in any given month. *See* N.H. Dep't of Health & Human Servs., *New Hampshire Medicaid Enrollment*

*Demographic Trends and Geography (January 2019)* 2 (Feb. 4, 2019), https://www.dhhs.nh.gov/ombp/medicaid/documents/nhhpp-enroll-demo-013119.pdf (last visited Mar. 20, 2019) (reporting enrollment for "NHHPP Eligibility Group"). Since the State first expanded, over 130,000 individuals have been enrolled at some point in time. New Hampshire Fiscal Pol'y Inst., *Medicaid Expansion in New Hampshire and the State Senate's Proposed Changes* 3 (Mar. 30, 2018), http://nhfpi.org/wp-content/uploads/2018/03/Issue-Brief-Medicaid-Expansion-in-New-Hampshire-and-the-State-Senates-Proposed-Changes.pdf (last visited Mar. 20, 2019).

64.    After Medicaid expansion, New Hampshire's uninsured rate fell from 10.7% in 2013 to 5.8% in 2017. New Hampshire Insurance Dep't, *2017 Final Report of the Health Care Premium and Claim Cost Drivers* 4 (Dec. 1, 2017), https://www.nh.gov/insurance/reports/documents/2018-nhid-annual-hearing-final-report.pdf (last visited Mar. 20, 2019).

65.    Large numbers of individuals in the expansion population have used their Medicaid coverage, receiving critical preventive care and treatment. As of September 2017, 25,800 individuals had obtained preventive care visits, while 10,500 had received screening for cervical cancer; 6,600, for breast cancer; and 4,700, for colorectal cancer. Moreover, 41,600 people received mental health services; 23,400 received cardiovascular treatment; 16,000 received services for asthma or chronic obstructive pulmonary disease; 11,000 received substance use disorder services; 6,100 received diabetes treatment; 1,300 received cancer treatment services. N.H. Dep't of Health & Human Servs., *New Hampshire Health Protection Program* 3-4 (Sept. 27, 2017), https://www.dhhs.nh.gov/ombp/pap/documents/dhhs-pap.pdf (last visited Mar. 20, 2019).

66.    In 2015, after implementing the Medicaid expansion, New Hampshire applied for a Section 1115 waiver called "New Hampshire Health Protection Program (NHHPP) Premium

Assistance" ("Premium Assistance Program") to change the way it provided coverage to the expansion group. The Secretary approved a two-year waiver, from January 1, 2016 through December 31, 2018. (*See* Letter from Andrew Slavitt, Acting Adm'r, Ctrs. for Medicare & Medicaid Servs., to Nicholas A. Toumpas, Comm'r, N.H. Dep't of Health & Human Servs. (Mar. 4, 2015) ("Premium Assistance Program") (Exh. A, hereto).

67.    Through this Premium Assistance Program, the State provided coverage to most of the expansion population by enrolling them in the private, qualified health plans offered on the Marketplace and paying their premiums. *Id.* at Special Terms and Conditions ¶ 26. Because the private plans do not cover all of the services that the Medicaid Act requires New Hampshire to provide, enrollees continue to receive some services directly through the State Medicaid program. *See id.* at Special Terms and Conditions ¶¶ 36-38.

68.    Individuals identified as medically frail were exempted from the Premium Assistance Program.

69.    The State's application also sought to waive retroactive coverage. The Secretary imposed conditions on the State before allowing this waiver, permitting the State to terminate retroactive coverage only if: (1) the State submitted data establishing that "there is seamless coverage that does not result in gaps in coverage prior to the time that a Medicaid application is filed, for individuals in the populations affected by the demonstration" and providing "a description of its renewal process and data related to that process, as well as any relevant data related to coverage continuity to evaluate whether individuals are losing coverage upon renewal"; and (2) CMS determined "that sufficient data has been provided to establish that retroactive coverage prior to the date of application is not necessary to fill gaps in coverage." *Id.* at Special Terms and Conditions ¶ 21.

70.     CMS has never made a determination that New Hampshire provided sufficient data to "establish that retroactive coverage prior to the date of application is not necessary to fill gaps in coverage."

**E.      The New Hampshire Health Protection Program Premium Assistance Amendment**

71.     On or about August 10, 2016, New Hampshire submitted a request to HHS to amend the Premium Assistance Program to, among other things, include a work requirement as a condition of eligibility in order to "increase personal responsibility." *See* Letter from Jeffrey A. Meyers, Comm'r, N.H. Dep't of Health & Human Servs., to Jennifer Kostesich, Project Officer, Div. of Medicaid Expansion Demonstrations, Ctrs. for Medicare & Medicaid Servs. (Aug. 10, 2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/nh/health-protection-program/nh-health-protection-program-premium-assistance-state-application-081016.pdf (last visited Mar. 20, 2019).

72.     CMS denied New Hampshire's request to impose the work requirement, stating in part that the proposal "could undermine access, efficiency, and quality of care provided to Medicaid beneficiaries and do[es] not support the objectives of the Medicaid program." Letter from Vikki Wachino, Dir., Ctr. for Medicaid & CHIP Servs., to Jeffrey A. Meyers, Comm'r, N.H. Dep't of Health & Human Servs. (Nov. 1, 2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/nh/health-protection-program/nh-health-protection-program-premium-assistance-cms-response-110116.pdf (last visited Mar. 20, 2019).

73.     On or about October 24, 2017, Governor Sununu again submitted a request to the Secretary to amend the Premium Assistance Program to include work requirements. Letter from Christopher T. Sununu, Gov. of N.H., to Eric D. Hargan, Acting Sec'y, U.S. Dep't of Health &

Human Servs. (Oct. 24, 2017), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/nh/nh-health-protection-program-premium-assistance-pa3.pdf (last visited Mar. 20, 2019), ("Premium Assistance Amendment").

74.     According to New Hampshire, the work requirements were intended to "encourage unemployed and underemployed adults to proceed to full employment," so that "residents graduate from safety net programs and attain or return [to] a financially stable life." *Id.* at 12.

75.     The State's request did not provide an estimate of the number of individuals who would lose coverage as a result of the work requirement.

76.     CMS held a public comment period on the proposed Premium Assistance Amendment from November 2, 2017 to December 2, 2017. *See* Medicaid.gov, New Hampshire Health Protection Program Premium Assistance – 2017 Amendment, https://public.medicaid.gov/connect.ti/public.comments/view?objectId=1893571 (last visited Mar. 20, 2019).

77.     On May 7, 2018, the Secretary approved the Premium Assistance Amendment, pursuant to Section 1115 and effective through the end of 2018. *See* Letter from Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs., to Henry D. Lipman, Medicaid Dir., N.H. Dep't of Health & Human Servs. (May 7, 2018), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/nh/health-protection-program/nh-health-protection-program-premium-assistance-appvl-2018-amdmnt-20180507.pdf (last visited Mar. 20, 2019), (hereinafter "Premium Assistance Amendment Approval").

78.     Although the Premium Assistance Amendment Approval only extended through December 31, 2018, it did not grant New Hampshire permission to implement the work requirement until on or after January 1, 2019.

F.      **The Granite Advantage Application**

79.      On or about July 23, 2018, Governor Sununu submitted another request to the Secretary, requesting permission to extend and amend the existing NHHPP Premium Assistance waiver in order to implement a new program called "Granite Advantage." Letter from Christopher T. Sununu, Gov. of N.H., to Alex M. Azar II, Sec'y, U.S. Dep't of Health & Human Servs. (July 23, 2018), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/nh/nh-health-protection-program-premium-assistance-pa4.pdf (last visited Mar. 20, 2019), (hereinafter "Granite Advantage Application").

80.      The Granite Advantage Application did not seek to extend the previous Section 1115 waivers that allowed the State to use the premium assistance model to cover the expansion population. *Id.* at 2-3.

81.      Instead, on or about August 6, 2018, New Hampshire submitted a State Plan Amendment to cover the Medicaid expansion population through Medicaid managed care plans starting January 1, 2019. The Secretary approved the State Plan Amendment on September 13, 2018. *See* New Hampshire State Plan Amendment 18-0009, *Managed Care - Addition of Granite Advantage Program,* https://www.medicaid.gov/State-resource-center/Medicaid-State-Plan-Amendments/Downloads/NH/NH-18-0009.pdf (last visited Mar. 20, 2019); *see also* Granite Advantage Application at 2.

82.      In the Granite Advantage waiver application, New Hampshire requested authority to extend the work requirements for a five-year period and to eliminate retroactive coverage. *See* Granite Advantage Application at 19-20 (listing requested waivers).

83.      Governor Sununu described the goal of the work requirements to "lift thousands of Granite Staters towards independence and self-sufficiency." *Id.* at 1.

84.     The State's request did not provide an estimate of the number of individuals who would lose coverage as a result of the work requirement. Likewise, New Hampshire did not indicate the number of individuals who would incur medical costs due to the elimination of retroactive coverage or the amount of those costs. The State did not include any data regarding the availability of seamless coverage in New Hampshire without retroactive coverage.

85.     CMS held a public comment period on the Granite Advantage Application from August 3, 2018 to September 2, 2018. *See* Medicaid.gov, New Hampshire Health Protection Program Premium Assistance Pending Application - Extension Application, https://public.medicaid.gov/connect.ti/public.comments/viewQuestionnaire?qid=1897891 (last visited Mar. 20, 2019).

86.     On November 30, 2018, the Secretary approved the Granite Advantage Application, effective through 2023. *See* Letter from Mary C. Mayhew, Deputy Adm'r & Dir., Ctrs. for Medicare & Medicaid Servs. to Henry D. Lipman, Medicaid Dir., N.H. Dep't of Health & Human Servs. (Nov. 30, 2018), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/nh/nh-granite-advantage-health-care-program-ca.pdf (last visited Mar. 20, 2019) (hereinafter "Granite Advantage Approval").

87.     The Granite Advantage Approval granted New Hampshire permission to implement the work requirement on or after January 1, 2019.

88.     The Granite Advantage Approval also waived the three-months' retroactive coverage requirement so that Medicaid coverage starts on the date of application. Neither the State's application nor the Secretary's approval explained how the State had met the condition CMS had previously set forth—that New Hampshire provide data sufficient to establish that the State had

implemented seamless coverage. *See* Granite Advantage Application; Granite Advantage Approval.

89.     HHS's approval of Granite Advantage did not provide an estimate of the number of individuals who would lose coverage as a result of the project.

Work and Community Engagement Requirements

90.     The Premium Assistance Approval and Granite Advantage Approval added a new condition of eligibility that is not permitted under the Medicaid Act: Enrollees ages 19 to 64 must engage in 100 hours of specified employment or community engagement activities every month and may not carry forward extra hours from one month to the next. Granite Advantage Approval, at Special Terms and Conditions ¶¶ 16, 18, 20-21.

91.     This work requirement does not apply to pregnant women, medically frail individuals, or individuals with a disability or other condition that prevents them from working. *Id.* ¶ 19. In addition, enrollees who meet certain other criteria are exempt from the requirement, such as having a child under age six, participating in a state-certified drug court program, being exempt from a work requirement in SNAP or TANF, and caring for a child with a disability. *Id.*

92.     Enrollees who are not exempt must report their work activities each month.

93.     Individuals can also obtain limited "good cause" exceptions to reduce the required number of hours they must complete each month. Individuals may request good cause for events like the birth or death of a family member, a family emergency, experiencing domestic violence, severe weather, and homelessness. To request good cause exceptions, individuals must generally calculate the extent of the exemption by multiplying the number of days the event prevented them from completing the requirements by 8 hours for each day.

94.     If enrollees subject to the work requirement do not meet it, the State will allow the individual to "cure" the missing hours (that is, to make up the missing hours) in the following month. *Id. ¶* 22(b). If an individual does not "cure" the missing hours in the following month, their coverage will be "suspended." *Id.* ¶ 22.

95.     When an individual's coverage is "suspended," they can reactivate coverage without submitting a new application. But the State will prohibit an individual whose coverage has been "suspended" from re-activating their coverage unless they satisfy the deficiency in the missing hours, demonstrate that one of the narrow "good cause" exceptions would have applied at the time of noncompliance, or show that they qualify for an exemption or a different Medicaid eligibility group. *Id.*

96.     As approved by CMS, beginning May 1, 2020, the "repeated consecutive use of the opportunity to cure . . . for an entire one-year eligibility period is prohibited." *Id.* ¶ 22(c). The State did not request this additional restriction on eligibility, and the public did not have an opportunity to comment on it. The Secretary did not define what it means to have "repeated consecutive use of the opportunity to cure."

97.     If an individual is not in compliance with the work requirements on their annual redetermination date, the State will terminate coverage. *Id.* ¶ 22(e).

98.     The State has begun implementation of the work and community engagement requirements. The State sent notices to Granite Advantage enrollees describing the new requirements. The State has also sent notices to individuals identifying who must comply with the requirements and who is automatically exempt. Individuals who are not exempt must begin complying with the requirements starting June 1, 2019.

Retroactive Eligibility

99.     The Medicaid Act requires States to provide that

in the case of any individual who has been determined to be eligible for medical assistance . . . such assistance will be made available to him for care and services included under the plan and furnished in or after the third month before the month in which he made application . . . for such assistance if such individual was . . . eligible for such assistance at the time such care and services were furnished.

42 U.S.C. § 1396a(a)(34).

100.    Separately, Section 1396d(a) defines "medical assistance" to include coverage for services received by eligible individuals during the three-month period prior to the month of application. *Id.* § 1396d(a).

101.    There is no authority for the Secretary to grant a waiver of Section 1396d(a).

102.    Under the Granite Advantage Approval, retroactive coverage as required by the statute is terminated. Instead, the State will only pay for services received on or after the date of application. Granite Advantage Approval, *supra*, at Special Terms and Conditions ¶ 17.

103.    New Hampshire stopped providing retroactive coverage as of January 1, 2019.

**G.     Action Taken by the Defendants to Allow Work Requirements**

104.    Prior to 2017, CMS's website stated that the purpose of Section 1115 waivers is to "demonstrate and evaluate policy approaches such as:

- Expanding eligibility to individuals who are not otherwise Medicaid or CHIP eligible;

- Providing services not typically covered by Medicaid; or

- Using innovative service delivery systems that improve care, increase efficiency, and reduce costs."

Medicaid.gov, *About Section 1115 Demonstrations*, https://www.medicaid.gov/medicaid/section-1115-demo/about-1115/index.html (last visited September 5, 2017). The "general criteria" CMS used when assessing waiver applications included whether the demonstration would:

1.  increase and strengthen overall coverage of low-income individuals in the state;

2.  increase access to, stabilize, and strengthen providers and provider networks available to serve Medicaid and low-income populations in the state;

3.  improve health outcomes for Medicaid and other low-income populations in the state; or

4.  increase the efficiency and quality of care for Medicaid and other low-income populations through initiatives to transform service delivery networks.

*Id.*

105.    Prior to 2017, CMS recognized that work requirements do "not support the objectives of the [Medicaid] program" and "could undermine access to care." Letter from Andrew M. Slavitt, Acting Adm'r, Ctrs. for Medicare & Medicaid Servs., to Thomas Betlach, Dir., Az. Health Care Cost Containment System (Sept. 30, 2016); *see* Sec'y of Health & Human Services Sylvia Burwell, Hearing on The President's Fiscal Year 2017 Budget, Responses to Additional Questions for the Record, U.S. House of Rep. Energy & Commerce Health Subcommittee at 35 (Feb. 24, 2016), https://docs.house.gov/meetings/IF/IF14/20160224/104521/HHRG-114-IF14-Wstate-BurwellS-20160224-SD002.pdf (last visited Mar. 20, 2019).

106.    As noted above, consistent with that understanding, in 2016, CMS denied New Hampshire's request to impose a work requirement in Medicaid, stating in part that the proposal "do[es] not support the objectives of the Medicaid program." Letter from Vikki Wachino, Dir., Ctr. for Medicaid & CHIP Servs., to Jeffrey A. Meyers, Comm'r, N.H. Dep't of Health & Human Servs. (Nov. 1, 2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/nh/health-protection-program/nh-health-protection-program-premium-assistance-cms-response-110116.pdf (last visited Mar. 20, 2019).

107.    The current HHS abruptly reversed course to authorize work requirements in Medicaid as part of President Trump's vow to "explode" the ACA and its Medicaid expansion. Amy

Goldstein & Juliet Eilperin, *Affordable Care Act Remains "Law of the Land," but Trump Vows to Explode It*, Wash. Post, Mar. 24, 2017, https://wapo.st/2Do6m8v (last visited Mar. 20, 2019).

108.    When he took office, President Trump signed an Executive Order calling on federal agencies to undo the ACA "[t]o the maximum extent permitted by law." Executive Order 13765, *Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal,* 82 Fed. Reg. 8351 (Jan. 20, 2017), https://www.federalregister.gov/documents/2017/01/24/2017-01799/minimizing-the-economic-burden-of-the-patient-protection-and-affordable-care-act-pending-repeal (last visited Mar. 20, 2019).

109.    On March 14, 2017, Defendant Seema Verma was sworn in as the Administrator of CMS. Defendant Verma and former Secretary Price immediately issued a letter to state governors announcing CMS's disagreement with the purpose and objectives of the Medicaid Act, stating that "[t]he expansion of Medicaid through the Affordable Care Act ('ACA') to non-disabled, working-age adults without dependent children was a clear departure from the core, historical mission of the program." *See* Sec'y of Health & Human Servs., Dear Governor Letter, at 1, https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf (last visited Mar. 20, 2019).

110.    Since then, Defendant Verma has made repeated public statements criticizing the expansion of Medicaid to "able-bodied individual[s]," advocating for lower enrollment in Medicaid and outlining plans to "reform" Medicaid through agency action. Casey Ross, *Trump health official Seema Verma has a plan to slash Medicaid rolls. Here's how*, Stat News, Oct. 26, 2017, https://www.statnews.com/2017/10/26/seema-verma-medicaid-plan/ (last visited Mar. 20, 2019).

111.    For instance, on June 27, 2017, Defendant Verma wrote an opinion piece in the Washington Post observing that "U.S. policymakers have a rare opportunity, through a combination of congressional and administrative actions, to fundamentally transform Medicaid." Seema

Verma, *Lawmakers have a rare chance to transform Medicaid. They should take it*, Wash. Post,
June 27, 2017, https://wapo.st/2yQ9XIE (last visited Mar. 20, 2019).

112.   On November 7, 2017, at a speech before the National Association of Medicaid
Directors, Defendant Verma declared that the ACA's decision to "move[] millions of working-
age, non-disabled adults into" Medicaid "does not make sense" and announced that CMS would
resist that change by approving state waivers that contain work requirements. Speech: Remarks by
Administrator Seema Verma at the National Association of Medicaid Directors (NAMD) 2017
Fall Conference, CMS.Gov (Nov. 7, 2017), https://go.cms.gov/2PELxLW (last visited Mar. 20,
2019).

113.   On November 10, 2017, Defendant Verma gave an interview in which she declared
that one of the "major, fundamental flaws in the Affordable Care Act was putting in able bodied
adults," declaring that Medicaid was "not designed for an able bodied person" and announcing
that CMS is "trying" to "restructure the Medicaid program." Wall Street Journal, *The Future of:
Health Care* (Nov. 10, 2017), https://on.wsj.com/2AMeGMW (last visited Mar. 20, 2019).

114.   In early November 2017, CMS revised its website to invite states to submit Section
1115 waivers that would:

1.   Improve access to high-quality, person-centered services that produce positive health
     outcomes for individuals;

2.   Promote efficiencies that ensure Medicaid's sustainability for beneficiaries over the
     long term;

3.   Support coordinated strategies to address certain health determinants that promote
     upward mobility, greater independence, and improved quality of life among
     individuals;

4.   Strengthen beneficiary engagement in their personal healthcare plan, including
     incentive structures that promote responsible decision-making;

5.   Enhance alignment between Medicaid policies and commercial health insurance
     products to facilitate smoother beneficiary transition; and

26

6.  Advance innovative delivery system and payment models to strengthen provider network capacity and drive greater value for Medicaid.

Medicaid.gov, *About Section 1115 Demonstrations*, https://www.medicaid.gov/medicaid/section-1115-demo/about-1115/index.html (last visited Mar. 20, 2019).

115.    On January 11, 2018, Defendant CMS issued the State Medicaid Letter, titled "Opportunities to Promote Work and Community Engagement Among Medicaid Beneficiaries." Letter from Brian Neale, Dir., Ctr. for Medicaid & CHIP Servs., to State Medicaid Directors (Jan. 11, 2018), https://www.medicaid.gov/federal-policy-guidance/downloads/smd18002.pdf (last visited Mar. 20, 2019).

116.    The nine-page document "announc[es] a new policy" that allows states to apply "work and community engagement" requirements to certain Medicaid recipients—specifically, "non-elderly, non-pregnant adult Medicaid beneficiaries who are eligible for Medicaid on a basis other than disability." *Id.* at 1.

117.    The State Medicaid Letter acknowledges that allowing states to implement work requirements "is a shift from prior agency policy." *Id.* at 3.

118.    The State Medicaid Letter was not submitted for notice and public comment and was not published in the Federal Register.

119.    The same day CMS issued the State Medicaid Letter, it received several letters critical of this novel policy position, including from members of Congress and nonprofit organizations. The National Health Law Program ("NHeLP") noted that the State Medicaid Letter "entirely ignore[d] the wealth of literature regarding the negative health consequences of work requirements, which was repeatedly cited by NHeLP and others in those state-specific comments." Letter from Jane Perkins, Legal Dir., Nat'l Health Law Prog., to Brian Neale, Dir., Ctrs. for Medicare & Medicaid Servs. (Jan. 11, 2018), https://9kqpw4dcaw91s37kozm5jx17-wpengine.netdna-

ssl.com/wp-content/uploads/2018/01/NHeLP-Letter-Re-Work-DSMD.pdf (last visited Mar. 20, 2019).

120.    On or about January 18, 2018, CMS further emphasized that it disagrees with the legislative expansion of Medicaid under the ACA and that it had announced the "new policy guidance" to support state implementation of work requirements intended to target that expansion population. CMS, Community Engagement Initiative Frequently Asked Questions, https://www.medicaid.gov/medicaid/section-1115-demo/community-engagement/index.html (last visited Mar. 20, 2019).

121.    In approving the Premium Assistance Amendment's work and community engagement requirement, CMS cited the State Medicaid Letter. *See* Premium Assistance Approval at 3. In both the Premium Assistance Approval and the Granite Advantage Approval, CMS included terms and conditions that require New Hampshire to follow requirements set out in the State Medicaid Letter. *See*, *e.g.*, Premium Assistance Amendment Approval at Special Terms and Conditions ("STCs") ¶ 44 (exempting from work requirement enrollees with an acute medical condition that would prevent compliance); Granite Advantage Approval at STCs ¶ 19 (same); Premium Assistance Amendment Approval at STCs ¶ 44 (exempting individuals identified by the state as medically frail); Granite Advantage Approval at STCs ¶ 19 (same); Premium Assistance Amendment Approval at STCs ¶ 44 (exempting enrollees participating in substance use disorder treatment); Granite Advantage Approval at STCs ¶ 19 (same); Premium Assistance Amendment Approval at STCs ¶ 44 (exempting enrollees who are exempt from SNAP/TANF work requirements); Granite Advantage Approval at STCs ¶ 19 (same); Premium Assistance Amendment Approval at STCs ¶ 45 (counting compliance with SNAP/TANF requirements as compliance with Medicaid work

requirements); Granite Advantage Approval at STCs ¶ 20 (same); Premium Assistance Amendment Approval at STCs ¶ 46(a) (requiring reasonable modifications for enrollees with ADA-protected disabilities, including exemption from participation); Granite Advantage Approval at STCs ¶ 21(a) (same); Premium Assistance Amendment Approval at STCs ¶ 48(n) (promising that New Hampshire will assess areas with limited economies and/or educational activities or higher barriers to participation to determine whether further exemptions or modifications are needed to the work requirement); Granite Advantage Approval at STCs ¶ 24(i) (same).

122.    The Secretary has implemented the policy guidance in the State Medicaid Letter and approved similar work requirements in several states: Kentucky, Arkansas, Indiana, Wisconsin, Michigan, Maine, Arizona, and most recently, on March 15, 2019, in Ohio. *See also* Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs. (@Seema CMS), Twitter (Mar. 5, 2018, 9:45 AM), https://twitter.com/SeemaCMS/status/1076221399390478336 (last visited Mar. 20, 2019) ("Maine marks the 7th community engagement demonstration we have approved since announcing this important opportunity earlier this year.").

123.    The Defendants have continued to express their opposition to the Medicaid expansion and their intent to transform the Medicaid program through work requirements. For example, Defendant Verma stated: "As you know, Obamacare put millions of people, millions of able-bodied individuals, into a program that was built for our most needy, for our most vulnerable citizens. And so, we think that the program needs change. It needs to be more adaptable and more flexible to address the needs of the newly-covered population." Interview by Bertha Coombs, CNBC, with Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs. (May 1, 2018).

124.    In July 2018, after *Stewart v. Azar*, 313 F. Supp. 3d 237 (D.D.C. 2018) vacated and remanded HHS's approval of Kentucky's Section 1115 waiver to, among other things, impose

work requirements and terminate retroactive coverage, Defendant Verma reiterated that CMS is "very committed" to work requirements and wants "to push ahead with our policy initiatives and goals." Dan Goldberg, *Verma: Court ruling won't close door on other Medicaid work requests*, Politico, July 17, 2018, https://www.politico.com/story/2018/07/17/trump-medicaid-work-requests-states-verma-726303 (last visited Mar. 20, 2019).

125. In July 2018, Defendant Azar similarly stated: "We are undeterred. We are proceeding forward. . . . We're fully committed to work requirements and community participation in the Medicaid program. . . . we will continue to litigate, we will continue to approve plans, we will continue to work with states. We are moving forward." Colby Itkowitz, *The Health 202: Trump administration 'undeterred' by court ruling against Medicaid work requirements,* Wash. Post, July 25, 2018, https://www.washingtonpost.com/news/powerpost/paloma/the-health-202/2018/07/27/the-health-202-trump-administration-undeterred-by-court-ruling-against-medicaid-work-requirements/5b5a10bb1b326b1e64695577/?utm_term=.7ba76e8a0719 (last visited Mar. 20, 2019); *see also* Alex M. Azar II, Sec'y, U.S. Dep't of Health & Human Servs., Remarks on State Healthcare Innovation at the American Legislative Exchange Council Annual Meeting (Aug. 8, 2018) ("[Defendant Verma] is now overseeing the next great generation of transformation in Medicaid, through our efforts to encourage work and other forms of community engagement.").

126. In a speech on September 27, 2018, Defendant Verma explained that the State Medicaid Letter "guidance was followed by four approvals of innovative Medicaid demonstrations" and elaborated that "[w]e are committed to this issue and we are moving closer to approving even more state waivers. As such, I'm happy to share with you today that we have finalized the terms for our next innovative community engagement demonstration, which we expect to deliver to the state very soon." Ctrs. for Medicare & Medicaid Servs., "SPEECH: Remarks by Administrator

Seema Verma at the 2018 Medicaid Managed Care Summit" (Sep. 27, 2018), https://www.cms.gov/newsroom/press-releases/speech-remarks-administrator-seema-verma-2018-medicaid-managed-care-summit (last visited Mar. 20, 2019).

127.    On December 21, 2018, Administrator Verma tweeted, "The Christmas sleigh has made deliveries to Kansas, Rhode Island, Michigan, and Maine to drop off signed #Medicaid waivers. Christmas came early for these Governors. . . ." Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs. (@Seema CMS), Twitter (Mar. 5, 2018, 1:13 PM), https://twitter.com/seemacms/status/1076224135037108224?lang=en (last visited Mar. 20, 2019).

128.    On March 11, 2019, President Trump issued his proposed 2020 budget. That budget proposes legislation to impose work requirements nationally and estimates the requirement will save $130 billion over ten years. *See* Dep't of Health & Human Servs., *FY 2020 Budget in Brief*, 100 (Mar. 11, 2019), https://www.hhs.gov/sites/default/files/fy-2020-budget-in-brief.pdf (last visited Mar. 20, 2019).

129.    On March 14, 2019, CMS issued new guidance, further implementing the policies announced in the State Medicaid Letter. The new guidance provides "standard monitoring metrics" that States must use to evaluate projects that require work or community engagement among working age adults. Ctrs. for Medicare & Medicaid Servs., "Press Release: CMS Strengthens Monitoring and Evaluation Expectations for Medicaid 1115 Demonstrations" (Mar. 14, 2019), https://www.cms.gov/newsroom/press-releases/cms-strengthens-monitoring-and-evaluation-expectations-medicaid-1115-demonstrations (last visited Mar. 20, 2019).

130.    The guidance repeatedly notes CMS will continue to apply the guidelines set forth in the January 11, 2018 State Medicaid Letter and clarifies that the January Letter communicates "CMS's expectation that states test the effects of community engagement requirements on health,

well-being, independence, and the sustainability of the Medicaid program." Ctrs. for Medicare & Medicaid Servs., Evaluation Design Guidance for Section 1115 Eligibility and Coverage Demonstrations 2 https://www.medicaid.gov/medicaid/section-1115-demo/downloads/evaluation-reports/ce-evaluation-design-guidance.pdf (last visited Mar. 20, 2019); Ctrs. for Medicare & Medicaid Servs., Appendix to Evaluation Design Guidance for Section 1115 Eligibility & Coverage Demonstrations: Community Engagement 1, https://www.medicaid.gov/medicaid/section-1115-demo/downloads/evaluation-reports/ce-evaluation-design-guidance-appendix.pdf (last visited Mar. 20, 2019) (State Medicaid Letter "signaled [CMS's] expectation that states will test hypotheses that such policies lead to increased employment and community engagement rates and that increased employment will promote health and wellbeing."); Seema Verma, "Good Ideas Must Be Evaluated," Ctrs. for Medicare & Medicaid Servs. Blog (Mar. 14, 2019), https://www.cms.gov/blog/good-ideas-must-be-evaluated (last visited Mar. 20, 2019) (noting that the guidance gives states "specific direction").

### H. Effects of the Granite Advantage Approval on the Plaintiffs

131. By approving the Granite Advantage Application, the Secretary has enabled the State to impose requirements and procedures that harm Plaintiffs by prohibiting them from obtaining and retaining Medicaid coverage.

132. The Granite Advantage Approval permits New Hampshire to eliminate all coverage prior to the date of application. If a Plaintiff loses coverage and then reapplies, the Plaintiff will not have retroactive coverage for health services received during the gap in coverage. Plaintiffs whose coverage is suspended or terminated for non-compliance with the work requirement and then re-activate or re-enroll will lose the three months of retroactive coverage they would have otherwise had during the gap in coverage.

133.    Continuous and adequate health insurance coverage is fundamental for each Plaintiff's ability to stay as healthy as possible and to work.

134.    The Secretary's action approving Granite Advantage will cause harm to Plaintiffs. Specifically:

135.    Plaintiff Samuel Philbrick is 26 years old and lives in Henniker, New Hampshire with his mother and father.

136.    Mr. Philbrick has a two-year associate's degree from a local community college. He currently works as a cashier in a sporting goods store where he makes $11.33 per hour. Until recently, he made $11 per hour.

137.    His schedule is irregular. For instance, in January and February, one week he worked 16 hours, and the next week he worked 24 hours. His manager determines his schedule, along with the schedules of the other cashiers.

138.    There is little to no public transportation near Mr. Philbrick's home. Mr. Philbrick does not have a driver's license. He generally has to rely on his father to drive him places, including his job.

139.    Mr. Philbrick used to work at a pizza restaurant that was closer to home, and easier to reach, but he was assigned fewer hours and paid less than at the sporting goods store.

140.    Mr. Philbrick enrolled in Medicaid in 2018, when he turned 26. Before that, he was insured as a dependent through his mother's insurance.

141.    Mr. Philbrick has chronic insomnia and takes Clonidine. Without the medication, he would be awake most of the night and would be groggy and cranky throughout the day. It would be hard for him to keep a job without the medication. He also sees his primary care physician regularly for an annual checkup and any ongoing needs.

142.    Mr. Philbrick received a letter stating that he would have to comply with the work requirement. He will need to complete 100 hours of work or other activities per month to maintain his Medicaid eligibility. Mr. Philbrick has difficulty keeping track of all of the Medicaid paper-work he receives.

143.    It is unlikely that Mr. Philbrick will be able to comply with the work requirement because he does not regularly receive 100 hours of work each month at his current job, and he will have difficulty getting transportation to complete other qualifying activities.

144.    Mr. Philbrick is afraid he will lose his Medicaid coverage, be unable to afford private insurance, and have to pay out of pocket for his medications.

145.    Had Mr. Philbrick known about the State Medicaid Letter and that it would allow states to condition Medicaid eligibility on work, he would have wanted to weigh in by submitting comments.

146.    Plaintiff Ian Ludders is 40 years old and lives in Unity, New Hampshire.

147.    Mr. Ludders lives by himself in a small cabin on a land trust, where he lives as part of a small cooperative community that emphasizes low-impact living. He has chosen to live a subsistence lifestyle that prioritizes living off the land.

148.    Mr. Ludders supports himself through seasonal work. He has worked in apple orchards for several years. He often prunes apple trees between January and April and picks apples during the harvest season between September and November. Some years, instead of working in the orchards, he has picked vegetables on farms and found other jobs, such as roofing, small-scale logging, lobster fishing, and tree maintenance work.

149.     This work is time-limited and depends on the needs of the various farms or orchards, the season, and the weather. There are often months where Mr. Ludders does not work 100 hours, particularly when he is in between paid jobs.

150.     This year, Mr. Ludders has lined up jobs pruning apple trees through approximately April or May 2019. After May 2019, he does not have any paid work lined up.

151.     The time off between jobs is important to Mr. Ludders, because that time allows him to focus on subsistence activities. He spends this time growing his own food and preparing firewood to heat his cabin. To gather enough firewood, Mr. Ludders fells trees, splits wood, and stacks logs, all by hand. Because the wood takes approximately one year to dry enough to be usable, he must plan ahead to ensure he has enough wood.

152.     These subsistence activities help Mr. Ludders keep expenses down. He spends approximately $570 per month to meet his needs, including land trust fees, food, utilities, car insurance, gas, car repairs, phone, and miscellaneous household expenses.

153.     These subsistence activities are also important to him because they enable him maintain his own self-sufficiency by living off the land.

154.     Mr. Ludders also spends time, when he is not working paid jobs, helping his older neighbors, completing activities such as hauling water and cutting and stacking firewood for their homes.

155.     Mr. Ludders has received Medicaid coverage since approximately 2015. He regularly sees his primary care provider and has also seen an eye doctor. He appreciates having Medicaid coverage in case he is injured while working, since his work can be dangerous.

156.     Mr. Ludders will be required to complete 100 hours of work or other activities per month. In early March 2019 he received a letter stating that he would have to comply with the

work requirements. He is worried he will not be able to comply because he often has months where he does not have paid work, and because he has no jobs lined up for June and July of 2019 when the work requirements go into effect.

157.    While he believes that helping his neighbors is a form of community service, he understands that it will not count towards his required 100 hours because the information he received said that the volunteer hours must be completed for an approved organization or agency. He anticipates that he will have to help his neighbors less because of the new work requirement.

158.    Mr. Ludders also expects that he will no longer have time to complete the various activities he does for subsistence living, like growing his own food and collecting firewood. As a result his heating and food expenses will likely increase.

159.    If his Medicaid coverage is suspended, Mr. Ludders will not be able to afford private insurance and worries about how he would pay for medical treatment if he were injured while uninsured.

160.    Had Mr. Ludders known about the State Medicaid Letter and that it would allow states to condition Medicaid eligibility on work, he would have wanted to weigh in by submitting comments to explain how seasonal work would make it hard to comply.

161.    Plaintiff Karin VLK is 36 years old and lives in Laconia, New Hampshire.

162.    Plaintiff Joshua VLK is 30 years old and lives in Laconia, New Hampshire.

163.    Mr. and Mrs. VLK are married and live together with three children, ages 5, 7, and 11. The youngest child will turn six on July 31, 2019. Mrs. VLK has a 14-year-old child who lives with the child's other parent.

164.    The VLK family is currently enrolled in the New Hampshire Medicaid program. Mrs. VLK was first enrolled in in Medicaid as a child. As an adult, she has been on Medicaid since

about 2016. In the interim, she tried to enroll in Medicaid but was frustrated trying to get the paperwork together that NHDHHS claimed it needed for her to qualify. Mr. VLK enrolled in Medicaid after the couple married in June 2018. Before that he was uninsured for about five years.

165. Mr. VLK has his GED and currently works in construction. He recently switched companies in an effort to find more hours and better pay. His current job pays $17 an hour, but the schedule is irregular. His company told him he could be assigned full time work soon, but there is no guarantee he will be offered full time hours. The number of hours he works depends on the jobs his employer books, and Mr. VLK's hours can be low if his employer is in between jobs or if they are waiting on supplies like lumber. For instance, in early March 2019, there was a week he only worked 16 hours, and another when he did not work any hours.

166. Mr. VLK also has to be available to take time off of work to care for Karin or the children when they are not well.

167. While he wants to work full time, between his variable schedule and his caregiving responsibilities, Mr. VLK expects there may be some months that he is not able to work 100 hours.

168. Mr. VLK suffers from an abdominal hernia, which hurts more after physical exertion. The family recently moved from an apartment to a rented house, and Mr. VLK overexerted himself when packing and lifting boxes. He often has to push his hernia back into his abdomen. When it is aggravated, the hernia limits his mobility and prevents him from lifting things. He is counting on Medicaid coverage to pay for surgery to treat the hernia. He wants to have the hernia surgery so he can lift heavier items at his construction job.

169. Mr. VLK is also currently in counseling to treat his severe anxiety, mild depression, and Attention Deficit Hyperactivity Disorder. Medicaid covers those counseling sessions.

170.    He also participates in drug counseling that was ordered by a state court while he is on probation. The court order lasts for approximately six more months, but Mr. VLK plans to continue attending counseling afterwards to maintain his recovery and prevent a downward spiral into depression. He will rely on Medicaid to cover those appointments. If he did not have Medicaid, he would likely not be able to attend the appointments, and he would then be in violation of the terms of his probation.

171.    Medicaid also covers his prescription for suboxone, which is used to treat opioid addiction.

172.    Mr. VLK's online account currently states that he is exempt from the work requirements because he is exempt from the SNAP work requirements. But he does not know what the specific reason is for the exemption; how long that exemption will last; what the specific reporting requirements connected to his Medicaid exemption status are; or what he must do to maintain his exemption status.

173.    Mrs. VLK is not currently working. She has her high school diploma and used to work jobs doing home caregiving. She performed tasks like helping people shop for groceries, bathe, and get ready for bed. She stopped working in May 2018 because her health problems have gotten worse, and she is no longer able to work.

174.    Mrs. VLK suffers from nerve damage and a neurological degeneration of the discs of her spine, a progressive disease that runs in her family. She had surgery on her lower back to treat the effects of the disease approximately 10 years ago.

175.    Her pain level has been increasing lately as a result of her back problems, and it is currently hard for Mrs. VLK to walk. Basic activities like driving and going to the grocery store make her very tired. She often lacks the energy to take her children to the public library to use the

library computers. Sometimes she is in so much pain that she cannot swallow food. When the family was packing and moving boxes recently, she felt so ill she almost passed out.

176.    Mrs. VLK used to volunteer for her church but does not do so anymore because she does not feel well enough.

177.    She needs surgery to treat her back condition and is counting on her Medicaid coverage to obtain the surgery. She thinks that if she can get the surgery, she may be able to go back to work after she recovers. She understands that the surgery will have no guarantees and that she will likely need future surgeries as well.

178.    Mrs. VLK also suffers from Attention Deficit Hyperactivity Disorder and Obsessive Compulsive Disorder. She experiences anxiety and depression as a result of her chronic pain and concern about her medical problems. Medicaid covers her counselling sessions for these conditions, as well as her prescriptions for Clonazepan and Hydroxyzine, which treat her anxiety.

179.    The VLK family expects that after their recent move, they will have at least $1,800 in expenses each month between rent, utilities, groceries, gas, cell phone bills, and other household expenses. Because they just moved to a new house, however, they do not know how much their utility costs will be each month. The VLKs have chosen not to purchase internet or cable to save money for other expenses. The VLKs have obtained clothing for the children through a local church pantry.

180.    The VLK family receives SNAP benefits, but still has challenges meeting their food needs. Because of Karin's health conditions, she may sometimes be on a liquid diet and then relies on Ensure. Ensure is very expensive. Sometimes they call their pastor's wife who will bring them items like meat and cereal.

181.    Mrs. VLK manages the families' paperwork to maintain their eligibility for Medicaid and SNAP. She provides NHDHHS with copies of Mr. VLK's paystubs and other information when necessary to renew their eligibility. She has an online account and has tried to upload documents in the past. But she has had several problems in the past uploading documents through her phone, which she uses to access the online portal because the VLKs do not have internet at home.

182.    When she has trouble uploading documents, Mrs. VLK must go in person to the NHDHHS office to provide the information. Mr. VLK does not have a driver's license, so when the family needs to drop off forms in person, Karin must drive, even if she is not feeling well.

183.    Mrs. VLK received a notice from NHDHHS and she understood from that notice that she would be required to complete 100 hours of work activities when her child turns six on July 31, 2019.

184.    Mrs. VLK is worried about the increased reporting the family will have to do to comply with the work requirements, and the burden that will place on her. Her ADHD and OCD make it difficult for her to complete paperwork. She is also worried about filling out and uploading the various forms and other documents to apply for exemptions and/or report the number of hours Mr. VLK works. She does not want to have to go into the office to drop off the forms because getting there and sitting in the office is painful and tiring. But the VLKs do not want Mr. VLK to miss work hours to go to the NHDHHS office during the day, and he does not have a driver's license, so Mrs. VLK will be the one completing and submitting the paperwork.

185.    Mrs. VLK is also worried about the process of getting documentation of her medical conditions from her doctors to try to prove an exemption once her child turns six this coming July. She does not want to spend time at her doctor's appointments completing paperwork to apply

for an exemption. She would rather spend the time with her doctors talking about her own health concerns.

186.    Without Medicaid coverage, the VLKs will be unable to pay for necessary medical care, including prescriptions, counselling, Mrs. VLK's back surgery and Mr. VLK's surgery to treat his hernia.

187.    Had Mr. and Mrs. VLK known about the State Medicaid Letter and that it would allow states to condition Medicaid eligibility on work, they would have wanted to weigh in by submitting comments objecting to the new requirements. They would have wanted to explain, based on their personal experiences, that when people lose their Medicaid coverage, they end up paying for emergency care and then often are forced to skip other bills, like a car loan or rent. They would have explained that, as a result, families end up being homeless or they lose their jobs, causing really bad results for the parents and the children.

## COUNT ONE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (STATE MEDICAID LETTER)

188.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

189.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

190.    The Premium Assistance Amendment Approval was explicitly based in substantial part on the policy announced in the January 11, 2018 State Medicaid Letter. Premium Assistance Amendment Approval at 3.

191.    The Granite Advantage Approval, which extended the waivers first authorized in the Premium Assistance Amendment Approval, is also based in substantial part on the policy announced in the January 11, 2018 State Medicaid Letter.

192.    The State Medicaid Letter was required to be, but was not, issued through notice and comment rulemaking. *See* 5 U.S.C. § 553.

193.    In issuing the State Medicaid Letter, the Defendants purported to act pursuant to Section 1115 of the Medicaid Act.

194.    Authorization of work and community engagement requirements is categorically outside the scope of the Secretary's Section 1115 waiver authority.

195.    In the State Medicaid Letter, the Defendants relied on factors that Congress has not intended them to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for their decision that runs counter to the evidence.

196.    The Defendants' issuance of the State Medicaid Letter exceeded the Secretary's Section 1115 waiver authority, otherwise violated the Medicaid Act, was arbitrary and capricious and an abuse of discretion, and ran counter to the evidence in the record.

### COUNT TWO: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (GRANITE ADVANTAGE APPROVAL)

197.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

198.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

199.    The Secretary's decision to approve Granite Advantage as described herein exceeded his authority under 42 U.S.C. § 1315, otherwise violated the Medicaid Act, was arbitrary and capricious and an abuse of discretion, and ran counter to the evidence in the record.

200.    Plaintiffs will suffer irreparable injury if the Secretary's actions approving Granite Advantage are not declared unlawful because those actions have harmed and will continue to harm Plaintiffs.

201.    Plaintiffs are in danger of suffering irreparable harm and have no adequate remedy at law.

## COUNT THREE: VIOLATION OF THE TAKE CARE CLAUSE, ARTICLE II, SECTION 3, CLAUSE 5

202.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

203.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

204.    The United States Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., art. I, § 1. Congress is authorized to "make all laws which shall be necessary and proper for carrying into Execution" its general powers. *Id.* §§ 1, 8.

205.    The Defendants' actions, as described herein, seek to undermine the ACA, including its expansion of Medicaid, and represent a fundamental alteration to those statutes.

206.    After a federal law is duly enacted, the President has a constitutional duty to "take Care that the Laws be faithfully executed." *Id.* art. II, § 3.

207.    The Take Care Clause is judicially enforceable against presidential action that undermines statutes enacted by Congress and signed into law. *See, e.g.*, *Angelus Milling Co. v.*

*Comm'r*, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of [the Executive Branch]."); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 612-13 (1838).

208.    The Take Care Clause limits the President's power, as well as the officers he personally appoints, including Defendant Azar, and ensures that the President and officers will faithfully execute the laws that Congress has passed.

209.    Under the Constitution, the President and his officers lack the authority to rewrite congressional statutes or to direct federal officers or agencies to effectively amend the statutes he is constitutionally required to execute.

210.    The Administrator of CMS has expressed the need to "fundamentally transform Medicaid."

211.    The power to "transform" a congressional program is a legislative power vested in Congress. An effort to "transform" a statute outside that legislative process is at odds with the President's constitutional duty to take care that the laws be faithfully executed.

212.    The Medicaid population targeted by the Granite Advantage Approval is the expansion population, which Congress added to Medicaid by passing the Affordable Care Act. The Executive Branch has repeatedly expressed its hostility to the Affordable Care Act and its desire to undermine its operation. An effort to undermine the Affordable Care Act by undoing the extension of Medicaid to the expansion population is at odds with the President's duty to take care that the laws be faithfully executed.

213.    The President's Executive Order set out herein direct agencies to take action contrary to the ACA, the Medicaid Act, and other laws passed by Congress.

214.    The Defendants' actions, as described herein, followed that Executive Order.

215.    The Defendants' actions, as described herein, seek to redefine the purposes and objectives of the Medicaid Act, including through the granting of the Granite Advantage Approval, and represent a fundamental alteration of Medicaid.

216.    The Defendants' actions, as described herein, seek to undermine the ACA, including its expansion of Medicaid, and represent a fundamental alteration to those statutes.

217.    Accordingly, the Defendants' actions are in violation of the Take Care Clause and are ultra vires.

218.    Plaintiffs will suffer irreparable injury if the Secretary's actions following the President's Executive Orders are not declared unlawful and unconstitutional because those actions have injured or will continue to harm Plaintiffs.

219.    Plaintiffs are in danger of suffering irreparable harm and have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that this Court:

1.    Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2);

2.    Declare that Defendants' issuance of the January 11, 2018 State Medicaid Letter violates the Administrative Procedure Act, the Social Security Act, and the United States Constitution in the respects set forth above;

3.    Declare that Defendants' approval of work and community engagement activities as a condition of Medicaid eligibility and elimination of retroactive coverage violates the Administrative Procedure Act, the Social Security Act, and the United States Constitution in the respects set forth above;

4.      Enjoin Defendants from implementing the practices purportedly authorized by the

January 11, 2018 State Medicaid Letter and the Granite Advantage Approval;

5.      Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C.

§ 2412; and

6.      Grant such other and further relief as may be just and proper.


March 20, 2019                                  Respectfully submitted,


By: /s/ Jane Perkins                            /s/ Kay E. Drought
    Jane Perkins                            Kay E. Drought
    Sarah Somers                            New Hampshire Legal Assistance
    Sarah Grusin                            154 High Street
    Catherine McKee                         Portsmouth, NH 03801
    National Health Law Program             603-206-2253
    200 N. Greensboro Street                kdrought@nhla.org
    Suite D-13
    Carrboro, NC 27510                      Raymond Burke
    Phone: 919-968-6308 (x101)              New Hampshire Legal Assistance
    perkins@healthlaw.org                   117 N. State Street
    somers@healthlaw.org                    Concord, NH 03301
    grusin@healthlaw.org                    603-206-2214
    mckee@healthlaw.org                     rburke@nhla.org

                                                 /s/ Travis W. England
                                               Travis W. England
                                                National Center for Law and
                                                Economic Justice
                                                275 Seventh Avenue, Suite 1506 New
                                                York, NY 10001
                                                212-633-6967
                                                england@nclej.org

                                                *Counsel for Plaintiffs*